Good morning. Good morning, Your Honor. Thank you for this. Okay. Your Honor, my name is Yuri Idstrom, and I'm here on behalf of the appellant plaintiffs, Kym Pardini and Carrie Wood. Your Honor, appellants' claims should not have been dismissed on the basis of preemption for two independent reasons. First, this is not a spray type based on the plain text of the regulations. The FDA has said that the spray type subcategory is meant for non-stick cooking sprays. This product is obviously not a non-stick cooking spray. Regardless, Unilever's second serving sizes do not comply with federal regulations because they are not based on the amount customarily consumed. As to my first point, this product is not a spray type. Look at the text of the regulation itself and the regulations as a whole. Look at the FDA's list of product categories and products. Look at the legislative intent. None of these show that the spray type subcategory is meant for a margarine spread that is packaged in a non-aerosolized bottle. Counsel, can I ask you a question about that? Sure. Is that a legal or a factual argument? Because you're referencing legislative history and such. Typically, that's to figure out the meaning of, in this case, I think it would be the meaning of a regulation, meaning of a law or meaning of regulation. At the same time, you're kind of making factual claims about how people use the product and such. I'm trying to figure out legal or factual argument. I think it's a mixed question of law and fact. Preemption is reviewed de novo. I think it's this court's task to construe those regulations in light of plaintiff's allegations, not what Unilever claims the product can be but what we have alleged it is. Anyway, the spray type subcategory, if you look at all of these, the legislative history, the regulations as a whole, it shows that the spray type subcategory is not meant for a non-aerosolized product that is promoted and used as a butter substitute and a topping. I mean, where are you getting that from? Because the regulation says spray types, and then it lists, as an example, or it lists a means about blank seconds per spray. But we have other information that tells us that's sort of demonstrative. It's not a specific requirement. Okay. So do you want to look at the regulation itself? So I think, Your Honor, you were looking at the regulation which says that the spray type subcategory, and then if you go across, it says about. Right. So what tells us this needs to be a cooking spray or that it needs to be aerosolized? You mean the regulation itself? Correct. Because we have the FDA document that says that the spray types category is meant for nonstick cooking sprays. Well, I don't think it says that that has to be everything it includes. I think that's at least an example of one. The question is, is that example exclusive? Right, Your Honor, and that's a good point. But what we have to remember is it's Unilever's burden to prove definitively that this is a spray type. And what the text of the regulation itself shows is that spray types are measurable by so many seconds spray. What they're contemplating is products that are dispensed in a continuous mist and can spread 2.5 grams of product over a large surface area. The fact that it doesn't preclude other products doesn't mean that that's what this – that that doesn't mean that this product is a spray type. The regulation could have said unit spray, but it doesn't. It says seconds spray, and this product can't be measured by the seconds because it is dispensed with a pump mechanism. And it doesn't contain propellant like other nonstick cooking sprays such that it could dispense 0.25 grams over a large surface area. But you're not contending that it comes out like a ketchup bottle, for example, as some kind of substance in that form. It comes out – it's using a spray mechanism through a bottle that has – You're contending that it comes out in a form like a ketchup bottle or a mayonnaise would. We can – Your Honor, if you would like to see how it comes out, I'm happy to show you. But it does squirt on into a very defined area. It is not a non-aerosol spray that could be used to distribute 0.525 grams of product over a large surface area like nonstick cooking sprays. Well, let me ask you this from the record, if you will. Does the record contain any evidence that I Can't Believe It's Not Butter is sold in a spreadable, semi-solid form? Does the record contain evidence of that? I believe that the complaint says that I Can't Believe It's Not Butter spray is a spread, like all other products in the I Can't Believe It's Not Butter line. But sold in a spreadable form allegation appears in the complaint. Your Honor, I would have to go back and look specifically. I don't know that we disagree. Do we know how it is that this spreadable form, if there's evidence of that, is liquefied? Is it an emulsion of some type? What is the liquid medium? Are we talking about the spray or are we talking about the tabs? I'm sorry, Your Honor. Well, I don't think my question is ambiguous. Let me try again, though. I Can't Believe It's Not Butter is sold in a spreadable form, a little plastic container you can serve like butter. Correct? Yes, Your Honor. All right. Now, that has to be liquefied in some way or another in order to come out as a spray. This product has been liquefied. Good. The answer to my question is yes, it is liquefied. It is liquefied. And do we know how it is liquefied? Is it in an emulsion with water or is it in an oil or is it alcohol? I mean, how is it done? It is an emulsion with water. So it is 60% water and 40% vegetable oil. So the only difference between the spreadable form and the spray form is the spray form has water added. It has more water added. All right. It has more water. They're all margarines mixed with water. So one has water and the other one has a little more water. Yes. All right. Now, is other than adding water to the pump spray form, is there any other change to the product itself that will increase or decrease calories? Relative to the other products in the I Can't Believe It's Not Butter line, no. All right. Thank you. So whatever number of calories there are in the spreadable form, is that listed in the spreadable form container? Yes. And how many calories is there, if you could tell us? Your Honor, I guess I would have to look at those products. It's not something that we alleged in the complaint, but I believe it's about 60 calories and 6 grams of fat. All right. Per serving? Per serving. All right. Now, in exhibit that I have listed as, let me see here, E3 rather, ER458, we're advised at 463 that spray type is listed as including only non-stick cooking sprays. Is that correct? Yes, Your Honor. That, I believe, is the FDA guidance document? Yes. Yes, Your Honor. And is there an allegation in the complaint or in any of the documents before us that suggest that I Can't Believe It's Not Butter is actually a cooking, non-stick cooking spray? Is there anything in the complaint that alleges that it is actually a non-stick cooking spray? No, Your Honor. We allege that it is not a non-stick cooking spray. It is not. All right. Cooking sprays are 100% vegetable oil. They contain propellant, and they are used to lubricate bakeware in 0.25 gram increments. This is not that product. It is not 100% oil. It is 60% water, which evaporates on contact with a hot pan, so it cannot be used to lubricate cookware in that way. All right. So if you'll turn to ER389, what is that document? And I'll finish here in short order, but I'd like to get to that. That is a capture of Unilever's website that was included in the complaint to show that Unilever recognizes consumers use more than five sprays, and that it is actually promoted to be used in increments that are more than five sprays. Plaintiffs allege that people use this product like butter and in amounts comparable to butter, and that is a use that Unilever itself encourages in its website and on its product, which depicts an ear of corn. You know, an ear of corn slathered with this product, that can't happen with one spray or five sprays. But to what extent can we – how do we make use of this? Because the FDA has conducted studies, and it has determined, in its view, how people use the product. It seems that you, your client, disagrees with that judgment. But is that a question that we can decide, or is that something that needs to be raised with the FDA, that some of these serving sizes and the regulation, in your view, don't fully state how consumers use the product? Well, Your Honor, the FDA has not definitively said that I can't believe it's not butter. Spray is a spray type, and it was the defendant's burden to prove that. But what we do have is we have – okay, the USDA is the one that conducted the consumption surveys. The FDA took that information, and it came up with these different product categories. And if you look at the commercial item description for buttery spreads that are styled as sprays, the USDA has said that they belong in the same reference category as butter because they are used interchangeably in the diet. So, Your Honor, the court is able to construe regulations, and they are able to determine that Unilever hasn't met its burden to show that this product is a spray type. It was their burden to prove that. And the regulation itself says that spray types must be measured by the second. The fact that other possibilities, like for the host of 144 products, are out there in terms of label statements, doesn't mean that this product is meant to include products that are pumped. So you say it's not a spray type. I think it's not a mayonnaise, a dressing, or a butter powder. So by process of elimination, does that mean you think it should fall into the butter, margarine, oil shortening category? It's not a process of elimination argument, Your Honor. That category specifically lists spreads. Plaintiffs have alleged that this is a spread. A spread is margarine mixed with water. That is what it is. And the FDA regulation, the FDA, sorry, the FDA guidance document has said that the butter, margarine, oil, and shortening category applies to spreads. That is what this product is. This product is not a nonstick cooking oil. It is not 100% oil. It is 60% water. It cannot be used that way. And consumers do not use it that way. Moreover, the Unilever has suggested in its recipes that it can't be used that way. Right. It is encouraging consumers to use it that way. But you could not spread one spray of this product. He's got to prime the pump. That. They're saying that that spray can be used to lubricate a pan and bake cookies in. That is absurd. And calling something a spray, affixing it with a nozzle, doesn't make it a spray type. You know, if that were the case, mayonnaise could be put in a spray type. Sorry. If that were the case, mayonnaise could be outfitted with a pump. I think, Your Honor, you're all familiar with the wishbone salad dressings. You know, they have a pump mechanism on them. They don't use the .25-gram serving size. Interestingly, Pam itself is packaged in a non-aerosolized bottle. It doesn't use the .25-gram serving size because it's not enough to have a pump on it. It has to be a nonstick cooking spray that is dispensed in a continuous mist, such that .25 grams reflects the amount customarily consumed. So on the Pam thing. Yeah. So Pam has it both ways, it sounds like you're saying, right? They have something kind of like that, but they also have an aerosol spray. So how do they do the aerosol spray one? They use this spray category? Yes. For the aerosolized sprays, which have a .25-gram serving size that can be measured by the second, they use a .25-gram serving size. And that is appropriate because, Your Honor, you have to look at the product characteristics, the dietary uses. Just to be clear, you're saying a .25 serving size because I think that's .2 or something when you squish it once. Yes. But you're saying that Pam, if you put .25 on the Pam, it would be enough? When Pam is packaged in an aerosolized container with propellant and it is 100% oil, it uses a .25-gram serving size. And that is appropriate because that product can be used to lubricate a pan in .25-gram increments. In the recipe that Unilever provides, it calls for 10 pumps? It calls for 10 pumps, yes, Your Honor. And how much is that in a quantitative? Well, so this is interesting. Five sprays, which is what's listed on their bottle, just happens to be the largest amount that they could include and still be under the .5-gram and 5-calorie threshold. So if they had used 6 sprays or 10 sprays, they would have had to declare 6 calories, 10 calories, depending. And importantly, consumers would have known that the product actually does contain fat and calories. We're taking you a little bit over your time, but I would suggest we'll put two minutes on the clock for rebuttal, and we'll hear from your opposing counsel. Thank you. May it please the Court, James Siegel on behalf of Apelli Unilever United States. The sole question presented here is whether I can't believe it's not butter spray, which is a liquid soybean-based oil spray. It probably falls within the FDA's category for spray types of oils and fats. Is it a spray type, or is it non-stick cooking sprays? So the actual regulation says spray types. The plaintiffs have relied on a guidance document that used to say that one example product. What year did it say it? I believe it was as of 2000. I'm not sure when it changed. I believe it changed maybe in the last four years. That's right. So at the time that the complaint is stated and the law at the time thereof, the guidance was in effect? Yes, Your Honor, and that's why they relied on it and below. But regardless, the regulations have not changed. The actual meaning of the regulations have not changed. The regulations say spray types. So taking the prior guidance, the guidance said it provided, as an example, it provided non-stick cooking sprays, e.g. PAM. That's what it said. That's all it said. I'll tell you what's troubling me. Unilever is basically taking a product which contains calories. In quantity, it actually contains calories. And it is adding water, spraying it, and telling consumers it contains zero calories. That just can't be. I mean, this is not some kind of magic formula that somehow transforms the product. All it does is dilute it. So because of dilution factors, if you spray it once, they are, as a matter of law, allowed to claim it has zero calories. But the minute you pump more than once, it becomes quite evident that, indeed, the product is not changed and it contains calories. And that bothers me. So help me through my dilemma. So a few points, Your Honor. So first, I think it's not just the dilution that renders this product different from the spread that you were referring to. Sure it is. It's because it's the dilution that makes it sprayable. Well, it's also the spray mechanism itself that the FDA is focused on. And the reason the FDA has defined these products that fall within this category in terms of the spray mechanism is because that affects how much consumers use the product. And so opposing counsel was referring to the USDA classifications and saying this is a spread under the USDA's classifications. The FDA hasn't used that classification. The FDA has actually said that it looks at different things than the USDA. USDA looks at things in terms of the ingredients used. The FDA looks at how it is used by consumers and how it's consumed. So just to take an example, USDA would classify every different type of soup by the ingredients. The FDA just says it's a liquid, it's in a bowl. People roughly eat the same amount of soup. That's one category. So it's the same here for sprays. So it may well be that an oil in a jar that you pour out, just a bottle of olive oil, that would be in the general oils category. But that very same bottle of oil, if you put it in a spray bottle and you spray it, it's now in the spray category. That's because the FDA determined that when consumers have a whole bottle of oil and they pour it out, they tend to use more than if they use the spray mechanism. So that's sort of the key distinction here. And then with respect to your point that consumers think it's a zero-fat product, that is the complaint that consumers have repeatedly raised the FDA. In the most recent rulemaking proceeding, consumers asked the FDA to change the reference amount for these spray-type oils, and the FDA declined. It said there was no evidence to support that conclusion. And, counsel, I assume they asked for that not necessarily only targeting, I can't believe it's not butter spray, but also Pam, right? Because, Pam, if you spray it for five seconds, it's like 40 calories, even though it, too, says that it has zero calories. That's exactly right, Your Honor. So the FDA's regs say what they say. You deliberately comply with them. To an extent, Your Honor and the plaintiffs disagree with the result of that. That's something to be taken up with the FDA. Can you respond to the argument about the promotional recipes?  Yes, Your Honor. So that recipe, I'm not sure quite how that would help the plaintiff's case here. That demonstrates that this product is used as a cooking spray. Oh, I think they say, well, it says 10 sprays, so that suggests that the serving size is understated. But, again, that would be something to take up with the FDA, that the question be whether the reference amount should be changed. I think that that's also a complaint consumers have had, that, in fact, the 0.25-gram reference amount is too low for a cooking spray. But the way the regs work, the Unilever was required to take the 0.25 grams as a starting point and then convert it into the household measure that most closely approximates that amount. And so 0.2, a spray, one spray is 0.2 grams. As the District Court observed, we couldn't say, you know, 1.25 sprays because that's not something consumers could use. So the closest household measure to the reference amount is the one spray. Had the FDA looked at the consumption data and determined that, in fact, people tend to use more sprays of oil when they're cooking, then they would have said a different reference amount, and Unilever would have followed that and used a larger serving size, maybe four or five sprays. Can your spray product be used as a non-sticking spray of one pump? Your Honor, I'm not sure, frankly. And the complaint doesn't allege that it can. Does the complaint allege that it cannot? The Second Amendment complaint does not. That's the operative complaint. The Third Amendment complaint, which was the court didn't let them file it and that hasn't been appealed, that contained additional allegations saying essentially it couldn't be used as a cooking spray with just one spray. So there aren't really any allegations properly in the record that even say that. But even if it did, that's not relevant. The question isn't can a consumer use one spray to cook a product. The question is, is it a spray within the FDA's regulations? And then if it is, the reference amount is set by the FDA. And you think cooking sprays are sprays, but there could be other kinds of sprays, and your client has a spray even though it may not typically be used for cooking. Is that fair? It is used for cooking, Your Honor. But, yes, the spray types category as defined by the FDA doesn't expressly need to be cooking sprays. I think that's probably the primary thing they were thinking of when they came up with this category. But the most recent guidance sort of makes that even more clear when the FDA said that it includes all types of cooking sprays. And by the allegations of the complaint or at least things that are referenced in it, the product we're talking about here can be used for cooking spray purposes as well? Exactly, Your Honor, and that's what that recipe shows. It is a cooking spray. It can also be used for toppings and is promoted for use as a topping. But, again, the FDA regulations recognize that a product where the reference amount is set based on one particular use may also have another promoted use. That doesn't mean the reference amount changes or the product category changes. What it means is that in some circumstances, the manufacturer has to provide a second column of information pertaining to that promoted use. That regulation doesn't even apply to Unilever because it has an express exception for nondiscrete products used in its ingredients like oils. So that regulation doesn't require the provision of a second column of information, but Unilever has voluntarily provided that. Do you have a question? Go ahead. So I guess I'm trying to figure out what happens if you, I mean, I can kind of see where you run into problems if you just, if a company just disagrees with the FDA and thinks, you know, our serving size is half of what you say, and so we're just going to put that on our label. But how about the other way? So just using butter, for example, I think I'm seeing that it's one tablespoon of butter. And if your company, I don't know why a company would ever do this, but if they decide, you know, I think most people use two tablespoons of butter. So you put two tablespoons of butter, which essentially what plaintiffs are saying you should have done here is you put two tablespoons. What happens if you do that, if you just say we disagree with the FDA and so we're going to go with a higher number? I mean, that would violate the FDA regulations. The FDA says you have to provide a serving size that most closely approximates the reference amount. So conceivably a butter. Even if you think that that's not actually accurate.  But they would be required to provide that first column of information saying one tablespoon. That uses their number even if you think, even if you thought that was. Even if they don't think it's correct. Even if they don't agree with the. But if you came to believe, you know, we're hearing that people actually take the spray mechanism off and like to douse their popcorn with this stuff, so we're going to go ahead and put two tablespoons on there. You'd be permitted to do that? In addition, so long as you had the baseline serving size? In that hypothetical, which has not really been alleged here, I think conceivably, yes, we could. I mean, that is essentially what Unilever did by providing the second five spray. Can you respond to your opposing counsel's mayonnaise hypothetical? Yes, Your Honor. So I think if there is in fact an actual spray mayonnaise that probably most likely does fall within the spray type subcategory of the FDA regulations, I think it's a little bit of a closer case because there is, again, there's a specific mayonnaise category and likely the FDA wasn't thinking of a viscous substance like mayonnaise being sprayed when it came up with these categories. So that's a bit of a closer case, and I'm not sure if there really would be an actual liquid spray of mayonnaise. I think there's a pump. They're talking about like a pump or something. I assume it's more like a ketchup squirter, as Your Honor referenced. That's somehow vaporized. That's somehow vaporized. I mean, I take it your position on what a spray type means is that it has to have some physical properties that we would normally associate with a spray. With a spray, that it's dispersed. Actually, the USDA has defined spray types. The USDA's regulations aren't generally relevant at all to here, but I think the description that the USDA has in the guidance they've cited that describes what a spray is is sort of directly on point. It has to be a dispersed liquid droplet. That's exactly what this product is. As a consumer, if I look at your client's spray product, what is it going to tell me about what calories are in that container? It's going to tell me zero, correct? That's correct, Your Honor, yes. But that's not true, correct? Well, it is true for the serving size. It's not even true for one spray, is it? I believe it's .8 calories per one spray, which the FDA says may be rounded down to zero. And then with respect to fat, I'm not sure exactly what the fat content is. It's less than .2 grams. But there you're required to say it's zero. Exactly. The FDA's regulations say that shall be said as zero grams. We could not say that there are more grams of fat. So I go just buying the product. It says zero. I say, ah, I'm watching my weight, which I should. And so I see the bottle. It says zero calories, zero grams. I mean, I am in heaven. I have finally found a fat-free product. Then I go to make popcorn, and I decide it needs a little more butter. So I spray it two times, three times, four times, ten times. I'm going to take the cap off if I really love butter. Am I eating zero calories? Absolutely not. That's right, Your Honor. And, again, this is the complaint that's been made to the FDA. And if Your Honor would like to make a complaint to the FDA, certainly that would be the avenue available. But the FDA's regulations are set up. When was this most recently brought to the FDA? I believe it was 2016, 2017. It was relatively recently. Is this in the record, or is it a source of public information, the FDA's response to that and some of the public comments? Yeah, it's a regulation. It's a public notice. It was a notice in comment rulemaking where they responded to comments requesting this change. It was in 2016? I believe it was 2016, yes, Your Honor. So what you're saying to me is if you, Judge Lucero, have a squawk, go ahead and concur and point this out, the absolute frivolity of the FDA's position that a spray, a spray has zero calories is not even true in the first instance? Yes, Your Honor, that is the complaint that's been made to the FDA. The FDA's response in the most recent rulemaking was there's no evidence to suggest that, in fact, consumers use more than this very small amount per serving. Well, their assertion in the complaint is that isn't that the case? Well, certainly they made that allegation, but the FDA relies on comprehensive surveys. Now, the fact that the FDA has jurisdiction to change this, does that necessarily mean that the court has no jurisdiction to act? No, Your Honor, this court has jurisdiction. We did make a primary jurisdiction argument below that was really in the alternative, but I think it's just a straightforward reading of the regulation's controls here, and that's something this court is well-positioned to do. Thank you. I thought I saw somewhere that, and I can't tell on that little bottle over there, but I thought I saw, do you not say that anymore, that it's zero calories? Do you not have that information? I mean, I know you have it on your nutrition facts, but maybe. I'm honestly not sure. We don't even own the product anymore, so I'm not sure what the current rules are. What did you say? You don't what? We don't. Unilever no longer owns the I Can't Believe It's Not Butter product. Who does own it? I'd say I can't. It's in the record by I honestly am not. I can't remember the name exactly. So you're not a necessary party anymore? No, we are still the defendant in this action who seeks damages related to the client. Your client holds the liabilities? Yes, Your Honor. It appears there's no further questions, so thank you very much for your argument this morning. I would ask that the court refer. We're going to put two minutes on the clock for rebuttal. Why don't you move that microphone down for us? Thank you. Can you hear me? Okay. Your Honor, you heard Unilever's counsel say that the fact that it's used for cooking means that it should be classified as a spray type. Any fat and oil product can be used for cooking. That doesn't make it a cooking spray. Well, I think his argument is that it has the physical properties and dispensing mechanisms of a spray. So how do you respond to that? Well, calling something a spray doesn't make it so. If I were to take, say, soy milk and call it milk on its label, it wouldn't be milk. It would be misbranded. And here plaintiffs are alleging that the spray types category is meant for nonstick cooking sprays that are aerosolized. This product is not aerosolized. It is not a spray type under FDA regulation. Respond to opposing counsel's point that this was brought to the FDA's attention, including in 2016, and they haven't changed the regulation. What was brought to the FDA's attention was that the serving size for nonstick cooking sprays wasn't adequate. Nonstick cooking sprays. Plaintiffs are alleging that this is not a nonstick cooking spray. And if you look at the document that they submitted, it's very clear that the way that the FDA talks about this spray type category, that they meant to only include nonstick cooking sprays. They don't say all types of cooking, all types of sprays. They don't say pump action squirt bottles. When they talk about this category. But, counsel, the general problem that you're talking about seems to be true of PAM as well as, I mean, PAM has to be a quarter of a second shot in order to fit within that, you know, to fit within where you have zero calories. And nobody, I don't think anybody probably thinks that somebody's spraying a quarter of a second of PAM on their pan. So it seems to me if your argument applies just equally to PAM, I mean, the difference I hear would be that this one has some butter flavor added to it and so can be used for uses beyond what PAM could be used for. But I'm having trouble with the problem that, like, that this automatically, you know, obviously is not used for cooking. I don't, it seems to me like it could be used for cooking. It just has to be used at a quantity greater than what the FDA says. But that's equally true for basically every spray type. Well, it's not a nonstick cooking spray. I mean, in order to find for Unilever, they would have, you would have to find that the spray type category is not limited to nonstick cooking sprays. Any fat and oil product can be used for cooking. That is not dispositive. What is dispositive is, is it, can it be, is it aerosolized? Is it 100% oil? Can it be dispensed in a continuous mist such that 0.25 grams is the amount customarily consumed? And, Your Honor, the regulations say you have to look at the product characteristics. You have to look at allegations as to how consumers use this product and the amounts that they customarily use. And, you know, you, let's see, and you also have to look at its major intended use. I mean, that's the other thing that I think we haven't talked about, which is, you know, their five-spray serving size has to also be based on the amount customarily consumed. And plaintiffs allege that it is not. Five sprays is not enough because consumers are using this product like butter and in amounts comparable to butter. And Unilever's own label and their own website are encouraging consumers to use it that way in excess of five. It was Unilever's burden. I think we have your argument. We've let you go well beyond your extra time. So unless there are further questions, I think we will conclude our argument this morning. I want to thank both counsel for the very helpful briefing and arguments. This matter is submitted. This also concludes court for today. We'll stand in recess until tomorrow morning.
judges: Lucero, BRESS, VANDYKE